IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 11–cv–01096–WJM–KMT

KATHLEEN SEABRON,
ROBERT LAYS,
CARLA LAYS,
KRISTY LARSON, and
VALERIE JENKINS, individually, and as class representatives of behalf of all others similarly
situated,

      Plaintiffs,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, and
AMERICAN STANDARD INSURANCE COMPANY OF WISCONSIN,

      Defendants.

---

# ORDER

---

    This matter is before the court pursuant to "Plaintiffs' Motion to Compel Complete

Putative Class Files & Documents" [Doc. No. 61] ("Mot.") filed September 16, 2011.

Defendants filed their response on October 7, 2011 [Doc. No. 75] ("Resp.") and Plaintiffs filed

their reply on October 21, 2011 [Doc. No. 80] ("Reply").  The Court heard argument on the

motion on October 31, 2011 and November 4, 2011. (Minutes, [Doc. Nos. 88 and 98]; Transcript

of October 31, 2011 [Doc. No. 127]; Transcript of November 4, 2011 [Doc. No. 126].)

Supplemental filings were allowed and submitted by both sides on November 11, 2011.

(Plaintiffs' Supplement [Doc. No. 99] ("Supp. Mot.") and Defendants' Supplement [Doc. No. 100]("Supp. Resp.").)  The matter is ripe for review and ruling.

Further, "Plaintiffs' Motion for Ruling on Pending Items and Extension of Time for Filing Motion for Class Certification" [Doc. No. 142] was filed on March 8, 2012 and Defendants' response to that Motion [Doc. No. 145] was filed on March 15, 2012.  Pending a ruling, the court stayed the looming deadline for filing class certification motions.  That Motion is now granted and the deadline for filing class certification motions is reset to July 10, 2012.

### Background

This case involves allegations that Defendants have adopted practices in their handling of uninsured motorist/under-insured motorist ("UM/UIM") claims submitted by their policyholders which are designed to under-compensate and delay payment to their insureds for claimed losses. Defendants deny the allegations.  The five named plaintiffs seek to represent a class of persons who allegedly have been victims of the bad faith practices alleged by Plaintiffs.  Discovery is currently in the class certification phase pending Plaintiffs' presentation to the court seeking to certify a class action pursuant to Fed. R. Civ. P. 23.  To that end, Plaintiffs have brought their Motion seeking complete case files maintained by Defendants for each of the putative class members via a Request for Production of Documents.  (*See* Mot., Ex. 6, "Defendants' Responses to Plaintiffs' First Set of Requests for Production of Documents", RFP No. 2 at 5.)  Defendants have interposed a number of objections to the relevant Request.  Further, Plaintiffs have also sought release of so-called "reserve" or claim valuation information as to all the putative class members and their files, including the named plaintiffs, and have requested that the information

2

provided in response to the subject Request for Production of Documents be electronically

submitted in native format.

Plaintiffs' Request for Production No. 2 reads

**Request for Production No.2:** Please identify and produce all documents and communications relating to and/or mentioning any and all UM/UIM claims made by persons within the State of Colorado under automobile insurance policies issued by you with dates of loss between May 4, 2006 and May 4, 2011 including, but not limited to, the complete "claim file" and "legal file" for each claim.

(*Id.*)  Defendants object to the following: a date limitation beginning in May 4, 2006 instead of

May 4, 2008; producing privileged information that may be contained in the files; producing

between 1200 and 1600 files as overly burdensome; producing medical or other private

documents which may violate privacy rights of non-parties; and producing information which is

unrelated to class discovery.  In spite of their objections, Defendants have agreed to produce ten

randomly chosen claim files in .tif format that meet the description set forth by Plaintiffs (but

only from May 4, 2008) if they are able to obtain consent from their insureds and upon redaction

of personal identifying information.  Defendants do not agree to production of any document in

native format and do not agree to provide privileged information or information pertaining to

"reserves" or "settlement authority."  (*Id.* at 6-14.)

I.      **Production of Claim Files**

The universe of claim files arguably responsive to RFP No. 2 is between 1600 (Plaintiffs'

estimate) and 1172 (Defendants' estimate).  Presumably this difference is accounted for by the

two year disagreement over the start date for production.  Defendants argue, "American Family

estimates that the time required to gather each claim file for production is between 2 and 6 hours.

3

(Alsup Decl. ¶ 3 (attached as Exhibit 12).)." (Resp. at 5.) Defendants claim that legal files "take even longer to produce than the claims files, because privileged matter in them needs to be produced." (*Id.*) Defendants estimate the burden of producing all files demanded by Plaintiffs "would be between over 5,000 hours to over 15,000 hours of work." (*Id.*)

Plaintiffs argue they need the claim files to establish the elements of a class action case, namely: numerosity, commonality, typicality and adequacy of the named plaintiffs as representatives of the class. Fed. R. Civ. P. 23. The Supreme Court instructs, "[t]he Rule's four requirements—numerosity, commonality, typicality, and adequate representation – effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, --- U.S. ----, 131 S.Ct. 2541, 2550 (2011) (internal citations omitted).

Class discovery "should be sufficiently broad that the plaintiffs have a fair and realistic opportunity to obtain evidence which will meet the requirements of Rule 23, yet not so broad that the discovery efforts present an undue burden to the defendant." *Montano v. Chao*, 07-cv-00735-CMA-KMT, 2008 WL 5377745, at *3 (D. Colo. Dec. 19, 2008). The scope of evidence subject to discovery under the federal rules is broad:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense-including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P 26(b)(1).

4

The court may, however, forbid the disclosure or discovery, specify terms for the disclosure or discovery, forbid inquiry into certain matters, or limit the scope of disclosure or discovery to certain matters to protect a party from undue burden and expense. Fed. R. Civ. P. 26(c)(1).

This court concludes that Defendants have met their burden to show "that responding to the discovery requests at issue would be unduly burdensome" as the request is currently postured. *Onesource Commercial Property Services, Inc. v. City and County of Denver,* Case No. 10–cv–02273–WJM–KLM, 2011 WL 2632894, *2 (D. Colo. July 6, 2011) (citing *Klesch & Co. v. Liberty Media Corp.*, 217 F.R.D. 517, 524 (D. Colo. 2003)).  As is oft said, discovery, by its very nature, is inherently burdensome to some extent.  The question, however, is whether the particular discovery sought is unduly burdensome.  Given that this case is in the pre-class certification stage of discovery, production of all the claims files and legal files of the uncertified putative class members, whether from 2006 or 2008, would be an unwarranted burden on Defendants.

That said, however, this court agrees that the claim and legal files requested by Plaintiffs may contain information relevant to various class certification inquiries.  First, as to numerosity, Plaintiffs allege that referring claims to either the medical services department or the claims legal department was part of Defendants' alleged scheme to deny or delay the appropriate payment of benefits to Defendants' insureds.  (*See* Third Amended Complaint [Doc. No. 47] at ¶¶ 59-62, 69, 71-78.)  Therefore, to determine the possible number of potential putative class members, it is necessary to determine what proportion, out of the total of UM/UIM claims presented in

5

Colorado during the relevant time period, were actually referred to medical services or claims legal, or both.

Further, to obtain class certification, it will be necessary for Plaintiffs to show typicality – whether the named plaintiffs' claims arise from the same course of events and involve legal issues similar to those of each putative class member.  Virtually the only way to do this would be to have at least a representative sampling of the course of claim handling for random potential class members, including those who were not referred to medical services or claims legal.  Since all the named plaintiffs, by definition, are claimants whose claims were referred to claims legal, Plaintiffs have sole possession of the claims where a lawsuit was not brought during the course of the claim's adjustment.  A representative sampling of claims and claims legal files would also be helpful to determine commonality – identifying common questions to which there is a need for common proof, rather than individual proof.  This prong, of course, could be addressed among the named plaintiffs and extrapolated to the putative class; however, such a course would not be as accurate as examining a sufficient number of files as to constitute a true representative sample of the group as a whole.

Requiring Defendants to produce a representative sample of claims and claims legal files in response to RFP No. 2 will satisfy both Plaintiffs' needs concerning their class action certification burden and Defendants' legitimate concern over massive document production of third-party information at a stage of the case where class certification is far from inevitable.

### A.       Time Period of the Sample

Plaintiffs bring claims for statutory and common law bad faith and abuse of process, which are subject to two-year statute of limitations periods, and violation of the Colorado Consumer Protection Act (CCPA), which is governed by a three-year statute of limitations period.  *See* C.R.S. §§ 13-80-102(1)(a) (bad faith, abuse of process); 6-1-115 (CCPA). Defendant asserts that the time period should not be longer than three years prior to the filing of the instant lawsuit.  Plaintiffs argue that the statute of limitations on a claim for insurance bad faith does not begin to run until the insured knows or should know of the injury and the cause of the injury, and therefore often does not accrue until the very end of a claim for contractual benefits.  (Reply at 3-4.)  They argue, "[t]hus, where the five (5) year statute of for UM/UIM claims set forth in C.R.S. § 13-80-107.5 applies, a claim for bad faith may not even begin to accrue until nearly 5 years after the accident."  (*Id.* at 4.)

As noted, the discovery rules in federal court are very broad.  Without deciding the applicable statute of limitations on any claim, this court finds that applying the longer term to the applicable discovery request is prudent and advisable to ensure Plaintiffs the widest accessibility of documents.  In close cases, the balance must be struck in favor of allowing the broader discovery. *Silva v. Basin Western, Inc*., 47 P.3d 1184, 1188 (Colo. 2002).  Whether such evidence will ultimately be admissible will be determined at a later date.  Therefore, in determining the list of potential putative class members, the operative start date for assessing whether the claim falls within the Request for Production No. 2 shall be May 4, 2006.

### B.      Representative Sample Size

The court notes that there is scant authority regarding the appropriate size of any sample of the claim and legal files in the class action discovery context, except for implicit approval of the methodology.  (*See* Manual for Complex Litigation, Fourth, §21.14 (2009).)  Defendants proposed to produce ten randomly selected files for the sample, citing as authority *Transamerican Refining Corp. v. Dravo Corp.*, 139 F.R.D. 619, 621 (S.D. Tex. 1991).[1]  ( Resp. at 6.)  In *Transamerican*, the court, without any specific findings or analysis concerning appropriate sample size, simply ordered, "the defendants shall identify and serve 50 absent class members [out of a total class membership of 6,000] with the interrogatories attached to their motion."  *Id.* at 622.  This represented a sample size of less than one percent of the class.  In *Transamerican*, however, the discovery forming the sample was to be obtained <u>from</u> the putative class members themselves.  In the case at bar, however, the information sought is <u>about</u> putative class members; no discovery or other information has been requested <u>from</u> the selected class members.  In their supplemental filing, Defendants revised their request with respect to sample size to embrace a slightly larger sample of 1-2% of the total putative class.  (Supp. Resp. at 5)  Since the putative class size, given the findings of the court in Section A, *supra*, is approximately 1600 members, if the exact formulation of *Tranamerican* were followed

---

[1] Defendants argue that no claim or legal files from putative class members should be produced; however in the spirit of compromise have proposed the limited production discussed herein.

(.0083%), the sample would be 13 files; one percent of the total would represent 16 files and two percent would represent 32 files.

Plaintiffs propose that any sample of putative class members' claims and/or legal files should be set at 25%.[2]  Twenty-five percent of 1600 would be a sample size of 400 files. Plaintiffs do not cite any authority for this percentage so the court concludes it is simply proposed as being somehow 'equitable,' largely as the court apparently did in *Transamerican*. Plaintiffs, however, add an additional wrinkle by proposing that the random sample be comprised of one-third files referred to Medical Services and one third files referred or assigned to claims legal.  (Supp. Mot. at 4.)  Plaintiffs do not specify where the remaining third would come from, so it is left for the court to guess that it could be files referred to both or neither Medical Services and/or claims legal.  This request strikes the court as being singularly <u>non-random</u> and therefore not representative of the putative class members as a whole.

The court finds that given the time burden placed upon Defendants and the stage of the litigation, a sample size of **ten percent** would adequately provide Plaintiffs with a sufficient sample to address the issues outlined herein concerning class certification, and would not place an unreasonable burden upon Defendants to produce.  Ten percent of the putative class files will be approximately 160 claims.

---

[2] Plaintiffs argue against a random sample being produced and request the court order production of all files; alternatively, however, they submit that if the court is inclined to allow discovery only on a sample basis at this point, the sample size should be no less than 25%. (Supp. Mot. at 4.)

9

Therefore, Defendants shall be required to select a sample of claims files using the following method:

1.   Identify all UM/UIM claims made by persons within the State of Colorado under automobile insurance policies issued by Defendants with dates of loss between May 4, 2006 and May 4, 2011.  Eliminate from that list the claims associated with the named plaintiffs in this action.  Assign every identified claim a unique identifying number.

2.   Organize the list in the same manner it is organized in Defendants' regular course of business, whether by case number, alphabetically, or other.  Defendants shall be prepared to describe how the master list was organized at the inception of compilation of the list.

3.   Randomly select a beginning number between one and nine.  This can be done by blind draw (use of a hat is optional).  The first file to be included in the random sample shall be the number drawn by blind draw.  Thereafter, every tenth claim shall be selected for inclusion in the sample.  Claims should continue to be drawn until the list is exhausted.  If the random draw results in fewer than 160 claims, explanation should be provided (e.g., the total sample size was 1427, therefore only 142 claims were drawn.)

4.   As to each claim drawn for inclusion determine whether there is a claim file, a medical services file and/or a legal file.  As to each uniquely numbered claim drawn, all files must be produced except for authorized redactions as stated in this order.

5.   As to all files to be produced under the unique claim number assigned for purposes of this discovery sample, claimant's personal identifying information shall be removed and all documents marked "confidential" pursuant to the Protective Order in this case.

6.   As to all files to be produced under the unique claim number assigned for purposes of this discovery sample, documents protected by privilege shall be removed or redacted and a privilege log created.

7.   As to all documents to be produced under the unique claim number assigned for purposes of this discovery sample, documents shall be produced in .tif or .pdf format as has been customary for document production between the parties.

### C.     Permissible Redactions, including Reserve Information

This case involves claims of an insured against his own insurance company, usually known as a first party claim.[3]  The purpose of uninsured motorist coverage is to compensate insureds for loss caused by negligent and financially irresponsible motorists outside the control of either the insured or his own insurance carrier.  *Parsons ex rel. Parsons v. Allstate Ins. Co.,* 165 P.3d 809, 814 (Colo. App. 2006); *Kral v. Am. Hardware Mut. Ins. Co.*, 784 P.2d 759 (Colo. 1989).  In this context, if the insured suffers a loss in an accident, the insurer must pay the insured, up to the limits of the policy, whatever losses the insured proves the insured is legally entitled to recover from the uninsured motorist.  *Id*.  Uninsured or underinsured motorist coverage is not triggered unless an insured is legally entitled to recover damages from the operator of an uninsured or under-insured automobile.  Colo. Rev. Stat. § 10–4–609(1)(a); *Parsons,* 165 P.3d at 814.

First party claims are uniquely different from third party claims because an insurer has a legal obligation to deal with an insured fairly and in good faith.  *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo.1984).

> [T]he duty of good faith derives from the relationship of an insured claimant to the provider of benefits. This relationship, arising from the underlying insurance or compensation obligation . . . permeates all of the dealings between the parties.

---

[3] A third party claim arises when a person damaged in an auto accident makes claims against the other driver's insurance company.  The claimant and the insurance company have, therefore, a completely adversarial relationship.

*Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1268 (Colo. 1985).  By obtaining insurance, an insured seeks to obtain some measure of financial security and protection against calamity, rather than to secure commercial advantage.  *Farmers Group,* 691 P.2d at 1141.  The duty results in a "quasi-fiduciary relationship" between insured and insurer.  *Id.*  The duty of good faith continues as long as the insurer-insured relationship exists.  *Bucholtz v. Safeco Ins. Co.*, 773 P.2d 590, 592 (Colo. App. 1988) (noting that such a duty can have limited abatement during an arbitration period); *Parsons,* 165 P.3d at 815.  Therefore, the court rejects Defendants' argument that insured and insurer are in a purely adversarial relationship when a claim is made for UM/UIM benefits.  (*See* Supp. Resp. at 2.)

   A bad faith insurance claim in Colorado "is the affirmative act of the insurer in unreasonably refusing to pay a claim and failing to act in good faith . . . that forms the basis for liability in tort."  *Farmers Group*, 691 P.2d at 1142.  For an insured to prevail on a bad faith breach of contract claim against his own insurance company, "the insured must establish the insurer acted unreasonably and with knowledge or reckless disregard of its unreasonableness."  *Parsons,* 165 P.3d at 815 (citing *Dale v. Guar. Nat'l Ins. Co.*, 948 P.2d 545, 551 (Colo. 1997)).  "The determination of whether an insurer has breached its duties to an insured in bad faith is one of reasonableness under the circumstances."  *Id.* (citing *Surdyka v. DeWitt*, 784 P.2d 819, 822 (Colo. App. 1989)).  The issue before the court for ultimate resolution in this case then, is to the extent any insured's valid claim was denied, reduced or delayed, whether a reasonable insurer under the circumstances would have denied or reduced or delayed payment of the claim.  *Id.*; *see also Pham v. State Farm Mut. Auto. Ins. Co.*, 70 P.3d 567, 572 - 73 (Colo. App. 2003).

12

"Modern statutes, including Colorado statutes, require insurers to maintain reserves to assure the insurer's ability to satisfy its potential obligations under its policies." *Silva*, 47 P.3d at 1189.  This is true of all claims, both first party and third party.  Reserves not only estimate the amount necessary to provide for the payment of all losses and claims for which an insurer may be liable, but also "reflect all potential claim expenses and any claims the insurer undertakes to defend since the insurer will have claim handling expenses, including attorney fees and court costs." *Id.*

"Settlement authority generally refers to an agent's ability to accept an offer of settlement that binds the principal up to and including a certain amount of money." *Id.*  "Statutory requirements, limitations in the evaluation, and bargaining tactics limit the usefulness of reserves and settlement authority as valuations of a claim." *Id.*, at 1190. Therefore, while reserves and settlement authority have some relationship to an insurer's estimation of liability, neither reflects an admission by the insurance company of a claim's worth.  *North River Insurance Company v. Greater New York Mutual Insurance Company*, 872 F. Supp. 1411, 1412 (E.D. Pa. 1995); *Silva*, 47 P.3d at 1190.

Colorado courts treat the insured's right to obtain discovery of the insurer's reserves or settlement authority differently in a first-party bad faith case than in a third-party bad faith case.  *Silva*, 47 P.3d at 1192 ("The scope of discovery of insurance information should therefore be broader in a first-party claim between an insured party and his insurer than in a third-party personal injury claim.  Consequently, courts have been more likely to find reserves and settlement authority discoverable in claims between an insured and his or her insurer, such

13

as a bad faith claim or declaratory judgment action, than in third-party claims."). *See also*

*Bischelli v. State Farm Mut. Auto. Ins. Co.*, Case No. 07-cv-00385-WYD-MEH, 2008 WL

280850 at *2 (D. Colo. Jan. 31, 2008) ("The case for discoverability is much stronger when a

bad faith claim is alleged and when the parties involved in a lawsuit are insured and insurer. )

Allowing a plaintiff to overcome an insurer's work product privilege may be particularly

appropriate in an action for bad faith, in light of the insurer's virtual monopoly over the evidence

required to support such an action. *Id.*; *see also Henderlong v. All State Ins. Co.*, Case No. 08-

cv-01377-CMA-MEH , 2009 WL 82493 at *2(D. Colo. Jan. 13, 2009).  In *Turner v. State Farm*

*Mut. Auto. Ins. Co.*, Case No. 09-cv-1926-CMA-KLM, 2010 WL 3239270 (D. Colo. 2010), the

District of Colorado specifically stated:

> State Farm's counsel claimed that this information [value of claims] was
> privileged based on *Silva v. Basin Western,* 47 P.3d 1184, 1193 (Colo. 2002).
> However, *Silva* is inapplicable to this case.  In *Silva*, the Colorado Supreme Court
> found that evidence of an insurance company's reserves and settlement authority
> is not discoverable in a third-party action against an insurance company. *Id.*  The
> present case is a *first-party action* against an insurance company and, therefore,
> this information is likely discoverable. *See id.* ("The scope of discovery has thus
> been traditionally broader in first-party disputes between an insured party and his
> or her insurer. Reserves have been correspondingly more likely to be found
> discoverable in such actions." (citation omitted)).

*Id.* at *3 n.4 (unpublished; emphasis added).

Evidence of the reserves and settlement authority in this case and over the life of the

claim – particularly if the claim was referred to medical services or claims legal – would provide

evidence of whether Defendants' conduct was reasonable or unreasonable and/or in good faith or

bad faith.  Again, the point is not to determine what the proper value of the claim actually was,

14

as would be the thrust of a third party action; in a bad faith case, the evidence of reserves and

settlement authority is directed at whether or not the insurer's actions toward its insureds were

reasonable.

Therefore, the court finds that evidence of reserves and settlement authority, or other

"values" applied to the claim in monetary terms, are discoverable in a case like this and

Defendants may not redact such information from the claims and legal files produced pursuant to

this Order.  For the same reasons, information about reserves and settlement authority, or other

"values" applied to the named plaintiff's claims in monetary terms, that was redacted in the

named plaintiffs' claim and legal files previously produced shall be provided.  Pages which were

redacted prior to transmission to Plaintiffs, therefore, should be replaced with those numbers left

intact.

However, the court finds that Plaintiff have made no showing sufficient to overcome

claims of work product or attorney/client privilege in other contexts; consequently, that

information should be redacted in the claims, medical and legal files produced in accordance

with this Order.  Information redacted on the basis of privilege should be reflected on a privilege

log consistent with previous orders and the Protective Order entered in this case.

### D.    *Privacy Issues*

Defendants have stated that the claims, medical and legal files of its insureds who made

UM/UIM claims during the relevant time period contain personal medical and other information.

(Resp. at 8.)  Defendants state the files may be protected by Title 15 U.S.C. §§ 6801(a), and

6802.  (Resp. at 8.)  Plaintiffs' counter that Title 15 U.S.C. § 6802(e)(8) exempts "documents

that are required to be produced in connection with a civil court proceeding from any of the

Act's proceedings." (Reply at 3.) Defendants do not dispute this statement in their supplemental

filing and, in fact, do not address the privacy concerns previously invoked with respect to

production of any claims or legal files at all. (*See* Supp. Resp.) This may well be a result of the

fact that the court entered a Protective Order on November 3, 2011, which will protect sensitive

information contained in the files produced pursuant to this Order. So the record is complete,

however, the court has reviewed the previous arguments advanced by Defendants.

> Title 15 U.S.C. § 6802(e)(8) provides

> (e) General exceptions
> Subsections (a) and (b) of this section shall not prohibit the disclosure of
> nonpublic personal information – . . .

>> (8) to comply with Federal, State, or local laws, rules, and other
>> applicable legal requirements; to comply with a properly
>> authorized civil, criminal, or regulatory investigation or subpoena
>> or summons by Federal, State, or local authorities; or to respond to
>> judicial process or government regulatory authorities having
>> jurisdiction over the financial institution for examination,
>> compliance, or other purposes as authorized by law.

*Id.* It appears to the court that this subsection of the Gramm-Leach-Bliley Act permits

Defendants to legally comply with production if ordered to do so by this court. Further, as to

non-parties' Colorado (not federal) physician-patient privilege, disclosure is permitted so long as

the court and a party to the proceeding protect the privilege. *Stauffer v. Karabin*, 492 P.2d 862,

865 (Colo. App. 1971). Further, "[c]ourts routinely deny defendants the standing to assert a

third party's right, including the physician-patient privilege." *People v. Palomo*, 31 P.3d 879,

885 (Colo. 2001) (collecting cases.)

16

As set forth *infra*, each claim meeting the criteria of RFP No. 2 shall be assigned a unique numerical identifier and the claimant's personal identifying information will be redacted from the file(s) prior to production.[4]  (Supp. Mot. at 4.)  All of the uniquely numbered claims and legal files drawn for production would then be marked "Confidential" and produced pursuant to the Protective Order [Doc. No. 93].  This method of production should pacify any privacy concerns, but still allow Plaintiffs access to information relevant to class certification.

### E.  Format

Documents produced pursuant to one party's request for production of documents are subject to the tenants of Fed. R. Civ. P. 34.  As to the responsibilities of the requesting party, Rule 34 provides:

> (a) In General.  A party may serve on any other party a request within the scope of Rule 26(b):
>   (1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:
>     (A) any designated documents or electronically stored information--including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations--stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

Fed. R. Civ. P. 34(a)(1)(a).  As to responding parties, the Rule provides:

> (D) Responding to a Request for Production of Electronically Stored Information. The response may state an objection to a requested form for producing electronically stored information. If the responding party objects to a requested

---

[4] Such redaction would not necessarily limit Plaintiffs' ability to later request that same personal identifying information should a class be certified and such information be otherwise discoverable.

form--or if no form was specified in the request--the party must state the form or forms it intends to use.

(E) Producing the Documents or Electronically Stored Information. Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:

   (i) A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request;

   (ii) If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms; and

   (iii) A party need not produce the same electronically stored information in more than one form.

Fed. R. Civ. P. 34(b)(2)(D)–(E)(iii).

The rule does not require a party to produce electronically stored information in the form it which it is ordinarily maintained, as long as it is produced in a reasonably usable form.

Advisory Comments Notes to Fed. R. Civ. P. 34(b), 2006 Amendment.  The Advisory notes go on, however

But the option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation.

*Id.*

The Scheduling Order entered in this case [Doc. No. 44] provides:

The parties shall use a unified exhibit numbering system.  Documents produced by either party shall be bates labeled. Consistent with this Court's Practice Standards, counsel will make good faith efforts to minimize voluminous evidence. Counsel will use electronic means to serve discovery in an effort to reduce discovery or litigation costs.

[Doc. No. 44 at 12.]  With respect to electronic discovery, the parties disagreed even early in the

case and stated

> Plaintiffs anticipate that there are large amounts of relevant data kept
> electronically, including financial analyses, audits, structuring and organizational
> methods. Plaintiffs assert the Sonoma Principles should be adopted, and that
> Documents, including Writings as that term is defined in Fed. R. Evid. 1001,
> should be produced in native form.
>
> American Family disagrees that ESI will be a significant source of discovery for
> this set of four individual insurance claim handling disputes. However, it is
> preserving all potentially relevant ESI. American Family anticipates producing
> discoverable ESI in an electronic format with the goal of limiting associated
> discovery costs and delays. The parties are continuing to meet and confer
> concerning ESI protocols to attempt to reach agreement on specific ESI protocols.
> American Family does not believe producing documents in native form is
> efficient or cost-effective, as it would eliminate the ability to bates-stamp
> documents, which both parties agree is necessary, and would make it impossible
> to stamp documents "Confidential", electronically or otherwise. American Family
> disagrees with the wholesale adoption of the Sedona Principles, which this Court
> has never held to be binding authority. American Family agreed to work with
> Plaintiffs' counsel regarding the need for native files on an as-needed basis when
> production of particular files in bates-stamped .tif format would make the
> document more difficult to use.

*Id.* at 12–13.

The court concurs with Defendants that natively produced documents cannot usually be

electronically Bates stamped, nor can they be electronically redacted or stamped for

confidentiality pursuant to Protective Order.  On the other hand, native production allows the

opposing side to view metadata contained in the document which is not available in a .tif or .pdf

document.  *The Sedona Principles*, *Second Edition* (2007), Cmt. 12.a and 12.b.

> There are two primary considerations in choosing the form of production: (1) the
> need for, or probative value of both apparent and metadata; and (2) the extent to
> which the production of metadata will enhance the functional utility of the

>electronic information produced and allow the parties to conduct a more cost-
>effective and efficient review.  These considerations should be weighed against
>the negative aspects associated with each format.

*Id.* at 190.  "In current practice, many parties, local rules and courts have endorsed the use of

image production formats, principally the Tagged Image File Format (TIFF) and Adobe Portable

Document Format (PDF)."  *Id.*

Plaintiffs have submitted the Declaration of Matthew W. Blake in support of their request

that claim files be produced by Defendants in native format.  (Mot., Ex. 17.)  Mr. Blake states

that the native format being used by Defendants is a database application called ICS Suite by

Insurance Claims Solutions ("ICS").  *Id.* at 3.  Mr. Blake opines that Defendants have run a

limited search of their database to produce the discovery documents.  Mr. Blake states that

notations on the upper left corner of each claim file stating "Note(s) have been individually

selected" suggest that the documents produced are not the true universe of each claim file.  *Id.* ¶

10.  Mr. Blake does not advise, however, how producing a sorted report from a database in

native format versus in .tif format after the record is retrieved would resolve this issue.  He

merely calls the production method objectionable on the basis the records are not produced

exactly how they are maintained in the regular course of business.  *Id.* ¶ 11.  This, of course, is

not the requirement of the Rule – the document can be produced as they are maintained in the

usual course of business OR in a reasonably useable form.  Production in .tif format is a

reasonably usable form, hence its current wide usage in discovery, and Plaintiffs have presented

no evidence to suggest otherwise in this case.

Mr. Blake concludes that production by Defendants in .tif format has "made the discovery of these documents unduly burdensome for Plaintiffs," without elucidating on even one fact supporting that conclusion. *Id.* Plaintiff does not further elaborate on its request that the claim files be produced in native format in any of the supplemental pleadings nor in its Reply. Plaintiff has given the court no indication of any value to be obtained from metadata in the documents it seeks.

Since the parties agreed on the need for electronic Bates numbering and both parties have heretofore produced documents in .tif or .pdf formats on both side, the court see no useful purpose for suddenly switching to unnumbered native format at this stage. Therefore, the court will not require production in native format.

It is therefore **ORDERED**

1.    "Plaintiffs' Motion to Compel Complete Putative Class Files & Documents" [Doc. No. 61] is GRANTED IN PART and DENIED IN PART consistent with this order. Defendants shall produce to Plaintiffs the sample claim, medical and legal files as discussed herein **on or before April 26, 2012.**

2.    "Plaintiffs' Motion for Ruling on Pending Items and Extension of Time for Filing

Motion for Class Certification" [Doc. No. 142] is GRANTED.  The deadline for Plaintiff to file a

Motion for Class Certification is extended to **July 10, 2012.**

Dated this 27th day of March, 2012.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge

22